UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ___25-60266-CR-DIMITROULEAS/HUNT___

18 U.S.C. § 371
50 U.S.C. § 4819
18 U.S.C. § 554
13 U.S.C. § 305
18 U.S.C. § 1956(h)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

FILED BY_____AT_____D.C.

**Nov 6, 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

UNITED STATES OF AMERICA

vs.

ANDREY MIKHAILOVICH PETROV,

       Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.  U.S. Company 1 was incorporated in Bend, Oregon, in December 2014 and thereafter relocated to Deerfield Beach, Florida in November 2021. U.S. Company 1 markets itself as a global aviation parts supplier. US Company 1 was acquired by OOO S7 Engineering, d/b/a S7 Technics ("S7 Technics"), in October 2021.

2.  ANDREY MIKHAILOVICH PETROV ("PETROV") is a U.S.-Russian dual citizen residing in Florida. PETROV was named Manager of U.S. Company 1 in November 2021 and was named President of U.S. Company 1 in March 2022.

3.  Co-Conspirator 1 is a Russian citizen residing in Russia and is the "Head of Sales Department" of S7 Technics. Co-Conspirator 1 maintains email accounts with domains associated

with U.S. Company 1 and with S7 Airlines, a Russian airline headquartered in Ob, Novosibirsk Oblast, Russia. Since June 24, 2022, S7 Airlines was subject to a Temporary Denial Order ("TDO") by the Department of Commerce, which has been renewed every 180 days since and remains in effect.

4.     S7 Technics, located in Russia, was a subsidiary of, and a Maintenance, Repair, and Overhaul ("MRO") provider to, S7 Airlines.

5.     UAE Company 1 was registered as a corporation in the United Arab Emirates in August 2022. Russian Person 1, the owner of S7 Airlines, was listed as UAE Company 1's sole shareholder. U.S. Company 1 was acquired from S7 Technics by UAE Company 1 in January 2023.

6.     Turkish Company 1 ("Turkish Company 1") is a consignee and shipping company located in Turkey.

**The Export Control Reform Act and Export Administration Regulations**

7.     On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). *See* 50 U.S.C. § 4801 *et seq.* ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

8.     ECRA provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA granted the President the authority, *inter alia*, to "control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons." 50 U.S.C. § 4812. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

9.     Through the EAR, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") reviewed and controlled the export of certain items from the United States to foreign destinations. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

10.    The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

11.    Since Russia's full-scale invasion of Ukraine on February 24, 2022, BIS has implemented a series of stringent export controls that restrict Russia's access to the technologies and other items that it needs to sustain its attack on Ukraine. As of April 8, 2022, license requirements for exports, reexports and transfers to or within Russia were expanded to cover all items on the CCL. *See* 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8.

12.    A TDO is an administrative order issued under the statutory authority of ECRA and the EAR and signed by the Assistant Secretary of Commerce for Export Enforcement when presented with evidence demonstrating the need to "temporarily deny export privileges when such an order is necessary in the public interest to prevent the occurrence of an imminent violation." 50 U.S.C. § 4820(a)(5); 15 C.F.R. § 766.24. Any named parties to the TDO, which further encompasses any related parties, agents, representatives, or those acting for or on their behalf, are

3

broadly prohibited from directly or indirectly participating "in any way" in a transaction involving commodities of United States origin or those otherwise subject to the EAR. The TDO also prohibits third parties from engaging in a broad range of conduct subject to the EAR with denied persons.

13.     Under ECRA, it was a crime to willfully violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(l).

## COUNT 1
**Conspiracy To Commit Offenses Against the United States**
**(18 U.S.C. § 371)**

1.     The general allegations in paragraphs 1 through 13 of this Indictment are hereby realleged and incorporated by reference herein.

2.     Beginning in or around April 2022 and continuing to the present, the exact dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ANDREY MIKHAILOVICH PETROV,**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully export and cause the exportation of goods from the United States to Russia without first having obtained the required licenses from the Department of Commerce in violation of Title 50, United States Code, Section 4819(a), and Title 15, Code of Federal Regulations, Section 764.2;

b.     to engage in any transaction and take any other action with intent to evade the provisions of Title 50, United States Code, Section 4819, the Export Administration Regulations,

and any order, license, and authorization issued thereunder, in violation of Title 50, United States Code, Section 4819(a)(2)(G);

        c.      to knowingly submit false and misleading electronic export information ("EEI") through the Automated Export System ("AES"), and cause the same, in violation of Title 13, United States Code, Section 305, and Title 15, Code of Federal Regulations, Section 30.71; and

        d.      to fraudulently and knowingly export and send from the United States any merchandise, articles, and objects contrary to laws and regulations of the United States, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to laws and regulations of the United States, in violation of Title 18, United States Code, Section 554.

## OBJECTS OF THE CONSPIRACY

3.      It was the object of the conspiracy for the defendant to acquire, on behalf of entities in Russia, aircraft equipment that was manufactured and/or sold in the United States; to export aircraft equipment from the United States to Russia and to Russian end users, including through intermediary destinations, such as Turkey; to conceal through dishonest means the prohibited activities and transactions from detection by the U.S. Government to avoid penalties and disruption of the illegal activities; to profit through these illegal activities; and to undermine the efforts of U.S. Government agencies to enforce export laws and regulations by evading the prohibitions and licensing requirements of ECRA and the EAR.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the Defendant and Co-conspirators sought to accomplish the object of the conspiracy included, among others, the following:

4.      Co-Conspirator 1 and employees of S7 Airlines and UAE Company 1 maintained

email accounts associated with US Company 1 and other companies, in order to obfuscate their association with S7 Airlines and its affiliates, including S7 Technics.

5.     Defendant **ANDREY MIKHAILOVICH PETROV**, as manager/operator of U.S. Company 1, would receive, either from Co-Conspirator 1 or from S7 Airlines directly, using various email addresses, a Request for Quote ("RFQ") for aircraft parts needed by S7 Airlines.

6.     **ANDREY MIKHAILOVICH PETROV** thereafter would acquire the requested aircraft parts from either U.S. Company 1 inventory or from outside vendors and would coordinate with a shipping company to arrange for export of the U.S. aircraft parts purchased by Co-Conspirator 1 or by S7 Airlines from the United States to transshipment points, such as Turkish Company 1 in Turkey, in order to conceal the true end users and ultimate destination of the aircraft parts.

7.     **ANDREY MIKHAILOVICH PETROV** thereafter provided the export shipping company a "Shipper's Letter of Instruction" that contained false and misleading ultimate consignee information, which was designed to conceal the true end users and ultimate destination of the aircraft parts.

8.     Based upon the false and misleading information provided in the "Shipper's Letter of Instruction" by **ANDREY MIKHAILOVICH PETROV,** a false or misleading EEI was generated by the export shipping company, which then was uploaded into the AES system as required by U.S. laws and regulations.

9.     Once the exported aircraft parts had reached the transshipment point, such as Turkey, the aircraft parts were thereafter shipped to Russia without the required licenses, in violation of U.S. export controls.

10.     Individuals associated with Co-Conspirator 1 or other Co-conspirators transferred funds for the purchase and shipment of the requested aircraft parts though bank accounts in

Uruguay and Turkey to **ANDREY MIKHAILOVICH PETROV's** bank account located at U.S. Financial Institution 1 in the United States.

### FAILURE TO OBTAIN A LICENSE

11.     During the relevant time period, the below items were identified on the CCL, classified by BIS under the corresponding ECCNs, and controlled for anti-terrorism reasons. As of February 24, 2022, an export license was required from the Department of Commerce to export or reexport each of these items to Russia.  An export license was required from the Department of Commerce to export or reexport each of these items to Russia, but the required licenses were not obtained and export or reexport of these items to Russia was not authorized by the Department of Commerce:

| Exported Item | ECCN |
|---|---|
| Brake Steering Control Unit (P/N E21327107; S/N 9262) | 9A991 |
| Inlet Assembly (P/N 15C0003007M1; S/N RMAIE280) | 9A991 |
| APU Actuator (P/N 106-1-1100-02; S/N 984) | 9A991 |

### OVERT ACTS

In furtherance of the conspiracy, and to achieve the objects thereof, **ANDREY MIKHAILOVICH PETROV** and Co-Conspirator 1, and other Co-conspirators unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others:

### CCL ITEM ONE

1.     On or about June 3, 2022, Co-Conspirator 1 sent a RFQ to a U.S. aircraft parts distributor ("U.S. Company 2") for, among other things, a Brake Steering Control Unit, P/N E21327107 ("CCL ITEM ONE"). Co-Conspirator 1 sent this email using an email address with a US Company 1-associated domain.

2.     On or about June 28, 2022, **ANDREY MIKHAILOVICH PETROV** sent an email

on behalf of U.S. Company 1 to U.S. Company 2 expressing U.S. Company 1's continued interest in the requested aircraft parts, including CCL ITEM ONE, and asked U.S. Company 2 to send certification documents related to CCL ITEM ONE.

3.      On or about July 11, 2022, Co-Conspirator 1, using an email address with a U.S. Company 1 associated domain, sent **ANDREY MIKHAILOVICH PETROV** an email containing a request to order CCL ITEM ONE. According to Co-Conspirator 1, payment for CCL ITEM ONE would occur after U.S. Company 2 had provided necessary certification documents with respect to CCL ITEM ONE.

4.      On or about July 11, 2022, **ANDREY MIKHAILOVICH PETROV** sent U.S. Company 2 a purchase order for CCL ITEM ONE.

5.      On or about July 12, 2022, **ANDREY MIKHAILOVICH PETROV** sent U.S. Company 2 a wire transfer in the amount of $22,000 as payment for CCL ITEM ONE.

6.      On or about July 25, 2022, **ANDREY MIKHAILOVICH PETROV** sent an email attaching two invoices, I1857 and I1858, which listed, among other things, CCL ITEM ONE to Co-Conspirator 1 and another Co-conspirator.

7.      On or about August 1, 2022, **ANDREY MIKHAILOVICH PETROV** sent an email to Co-Conspirator 1 and another Co-conspirator, informing them that CCL ITEM ONE had been received by U.S. Company 1 and that the item was available for pickup.

8.      On or about August 17, 2022, **ANDREY MIKHAILOVICH PETROV**, as the sole signatory on the U.S. Company 1 bank account at U.S. Financial Institution 1, received two wire transfers totaling $72,000.47 from an account in the name of Uruguayan Company 1 held in Uruguay, for the purchase of CCL ITEM ONE and other assorted aircraft parts.

9.      Based on information provided by **ANDREY MIKHAILOVICH PETROV**, on or about August 23, 2022, the U.S.-based shipper of CCL ITEM ONE identified Turkish Company

1 as the Ultimate Consignee in the EEI. This information was false because the ultimate consignee was S7 Airlines located in Russia.

10.     On or about August 26, 2022, at the direction of Co-Conspirator 1, U.S. Company 1 exported CCL ITEM ONE, and other assorted aircraft parts, to Turkish Company 1.

11.     On or about October 3, 2022, **ANDREY MIKHAILOVICH PETROV** sent an email to representatives at S7 Technics, located in Russia, containing certification documents for parts that were contained in the same shipment as CCL ITEM ONE.

12.     On or about October 7, 2022, **ANDREY MIKHAILOVICH PETROV** sent another email to representatives at S7 Technics, located in Russia, containing additional certification documents for parts that were contained in the same shipment as CCL ITEM ONE.

13.     On or about October 20, 2022, **ANDREY MIKHAILOVICH PETROV** sent an additional email to representatives at S7 Technics, located in Russia, containing certification documents for parts that were contained within the same shipment as CCL ITEM ONE.

CCL ITEM TWO

14.     On or about January 4, 2022, Co-Conspirator 1 responded via email to a RFQ for an Inlet Assembly, P/N 15C0003007M1 ("CCL ITEM TWO") and stated that the part was in stock at U.S. Company 1, S7 Airline's "daughter company." Co-Conspirator 1 sent this email using an email address with a S7 Airlines-associated domain. **ANDREY MIKHAILOVICH PETROV** was copied on this email.

15.     On or about October 21, 2022, an individual from Russian Airlines 1 bearing the initials "V.S." sent an email to **ANDREY MIKHAILOVICH PETROV** requesting spare parts, including CCL ITEM TWO, from a disassembled Embraer aircraft.

16.     On or about October 21, 2022, **ANDREY MIKHAILOVICH PETROV** responded to V.S. via email that U.S. Company 1 did not have any of the requested parts from the

disassembly but that U.S. Company 1 did have CCL ITEM TWO in stock. **ANDREY MIKHAILOVICH PETROV** attached trace documents to his response.

17.     On or about October 26, 2022, "V.S." emailed **ANDREY MIKHAILOVICH PETROV** and Co-Conspirator 1 and stated that S7 Airlines was ready to pick up CCL ITEM TWO from U.S. Company 1 and that **PETROV** needed to send a quote for the part. V.S. further asked Co-Conspirator 1 how V.S. could buy the part and quickly get it to Moscow Domodedovo International Airport, located in Moscow, Russia.

18.     On or about October 27, 2022, **ANDREY MIKHAILOVICH PETROV** was blind copied on an internal S7 Airlines email requesting a quote to purchase CCL ITEM TWO.

19.     On or about October 28, 2022, once the purchase of CCL ITEM TWO had been approved, Co-Conspirator 1 sent an email to S7 Technics representatives stating that the delivery to Russia was put into operation. **ANDREY MIKHAILOVICH PETROV** was copied on this email.

20.     On or about October 28, 2022, **ANDREY MIKHAILOVICH PETROV** received an email from an individual at Turkish Company 1 in Turkey that contained purchase order P10766222 for CCL ITEM TWO.

21.     On or about October 28, 2022, **ANDREY MIKHAILOVICH PETROV** responded to Turkish Company 1 and attached sales order S1921 for CCL ITEM TWO.

22.     On or about October 28, 2022, **ANDREY MIKHAILOVICH PETROV** responded to Turkish Company 1, stating that the shipment would be ready for pick up in one to two hours and attached release documentation.

23.     On or about October 28, 2022, **ANDREY MIKHAILOVICH PETROV** responded to Turkish Company 1 via email that CCL ITEM TWO was ready for pick up, provided the dimensions and invoices, and attached a completed Shipper's Letter of Instruction for CCL

ITEM TWO.

24.     Based on information provided by **ANDREY MIKHAILOVICH PETROV**, on or about October 28, 2022, the U.S.-based shipper of CCL ITEM TWO identified Turkish Company 1 as the Ultimate Consignee in the EEI. This information was false because the ultimate consignee was S7 Airlines located in Russia.

25.     On or about October 29, 2022, at **ANDREY MIKHAILOVICH PETROV's** direction, CCL ITEM TWO was exported to Turkey by a freight forwarder using a Turkish airline.

26.     On or about November 10, 2022, **ANDREY MIKHAILOVICH PETROV**, as the sole signatory on the U.S. Company 1 bank account at U.S. Financial Institution 1, received a wire transfer in the amount of $142,339.00 from an account in the name of Turkish Company 1 held in Turkey, for the purchase of CCL ITEM TWO and other assorted aircraft parts.

CCL ITEM THREE

27.     On or about September 21, 2022, Co-Conspirator 1 sent an email to **ANDREY MIKHAILOVICH PETROV**, asking **PETROV** for weight and dimensions of an upcoming delivery of aircraft parts. Co-Conspirator 1 sent this email using an email address with a S7 Airlines-associated domain.

28.     On or about September 26, 2022, **ANDREY MIKHAILOVICH PETROV** responded to Co-Conspirator 1's email, providing weights and dimensions for six boxes weighing 98 pounds in the aggregate.

29.     On or about September 30, 2022, an employee of S7 Technics emailed **ANDREY MIKHAILOVICH PETROV** asking him to "convert the customer and consignee" for US Company 1 invoice I1927 (sales order S1900) to Turkish Company 1. The invoice for the sales order showed that the items would ship in six boxes with a total weight of 98 pounds. Co-Conspirator 1 was copied on this email. Among the items identified in the invoice was an APU

Actuator, P/N 106-1-1100-02, S/N 984 ("CCL ITEM THREE").

30.     On or about September 30, 2022, **ANDREY MIKHAILOVICH PETROV** responded to the above email, confirming that he revised the invoice/sales order to identify Turkish Company 1. Co-Conspirator 1 was copied on this email.

31.     On or about October 21, 2022, **ANDREY MIKHAILOVICH PETROV** emailed an employee of Turkish Company 1, telling the employee that the order, consisting of six boxes and weighing 98 pounds, was "good to go."

32.     On or about October 24, 2022, the employee at Turkish Company 1 responded to **ANDREY MIKHAILOVICH PETROV**, identifying a Turkish logistics company as Turkish Company 1's freight forwarder and asking the logistics company to arrange shipping from Miami, Florida. The purchase order identified in the email from Turkish Company 1 was PO P10602522, which matches the customer PO# listed on U.S. Company 1 invoice I1927.

33.     On or about October 25, 2022, an employee at the Turkish logistics company emailed PETROV. The subject of this email was "PO P10602522 for TURKISH COMPANY 1." The body of the email listed the cargo weight as 45 kilograms (approximately 99 pounds) and gave shipping costs from "USA [MIA] --- Turkey [IST]" and from "Turkey [IST]---Russia [SVO]."

34.     On or about October 25, 2022, **ANDREY MIKHAILOVICH PETROV** received an email from the logistics coordinator at a U.S.-based freight forwarder. An employee from the Turkish logistics company was copied on this email. The subject of the email identified Turkish Company 1 and told PETROV that the U.S. company had "been requested to arrange the pickup and shipping of the cargo going to Russia." Attached to the email was U.S. Company 1 invoice I1927.

35.     On or about October 25, 2022, **ANDREY MIKHAILOVICH PETROV** responded to the above email, copying the employees from the Turkish and U.S. logistics

companies. The email identified the same six boxes and the same weight as in the emails sent to Co-Conspirator 1 and Turkish Company 1. **ANDREY MIKHAILOVICH PETROV** confirmed that the shipment was ready for pick up at U.S. Company 1 in Florida.

36.     Based on this information provided by **ANDREY MIKHAILOVICH PETROV**, on or about October 25, 2022, the U.S.-based shipper of CCL ITEM THREE identified Turkish Company 1 as the Ultimate Consignee in the EEI. This information was false because the ultimate consignee was S7 Airlines located in Russia.

37.     On or about October 20, 2022, **ANDREY MIKHAILOVICH PETROV**, as the sole signatory on the U.S. Company 1 bank account at U.S. Financial Institution 1, received a wire transfer in the amount of $64,232.00 from an account in the name of Turkish Company 1 held in Turkey, for the purchase of CCL ITEM THREE and other assorted aircraft parts.

38.     On or about October 27, 2022, at **ANDREY MIKHAILOVICH PETROV's** direction, CCL ITEM THREE was exported to Turkey by a freight forwarder using Turkish Airways.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-4
### Unlawful Export of Controlled Goods to Russia
### (50 U.S.C. § 4819(a))

1.     The general allegations in paragraphs 1 through 13 of this Indictment are hereby realleged and incorporated by reference herein.

2.     On or about the dates listed for each count, in the Southern District of Florida and elsewhere, the defendant,

### ANDREY MIKHAILOVICH PETROV,

did knowingly and willfully export, attempt to export, and cause the export and attempted export of goods from the United States to Russia, without first having obtained authorization or a license

from the U.S. Department of Commerce, in violation of Title 50, United States Code, Section 4819(a) and Title 18, United States Code, Section 2, as set forth in the below counts.

| COUNT | APPROX. DATE OF EXPORT | EXPORTED ITEMS | ECCN |
|---|---|---|---|
| 2 | August 26, 2022 | Brake Steering Control Unit (P/N E21327107, S/N 9262) | 9A991 |
| 3 | October 27, 2022 | APU Actuator (P/N 106-1-1100-02, S/N 984) | 9A991 |
| 4 | October 29, 2022 | Inlet Assembly (P/N 15C0003007M1, S/N RMAIE280) | 9A991 |

**COUNT 5-7**
**Smuggling Goods from the United States**
**(18 U.S.C. § 554)**

1.      The general allegations in paragraphs 1 through 13 of this Indictment are hereby realleged and incorporated by reference herein.

2.      On or about the dates listed for each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ANDREY MIKHAILOVICH PETROV,**

did fraudulently and knowingly export and send from the United States, any merchandise, articles, and objects contrary to the laws and regulations of the United States, that is, Title 50, United States Code, Section 4819 and the EAR, Title 13, United States Code, Section 305, and 15 CFR Part 30, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to such laws and regulations of the United States, in violation of Title 18, United States Code, Sections 554 and 2, as set forth in the below counts:

| COUNT | APPROX. DATE OF EXPORT | EXPORTED ITEM | ECCN |
|---|---|---|---|
| 5 | August 26, 2022 | Brake Steering Control Unit (P/N E21327107, S/N 9262) | 9A991 |

14

| 6 | October 27, 2022 | APU Actuator (P/N 106-1-1100-02, S/N 984) | 9A991 |
| 7 | October 29, 2022 | Inlet Assembly (P/N 15C0003007M1, S/N RMAIE280) | 9A991 |

### COUNTS 8-10
### False Export Information
### (13 U.S.C. § 305)

1.    The general allegations in paragraphs 1 through 13 of this Indictment are hereby realleged and incorporated by reference herein.

2.    On or about the dates listed for each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

### ANDREY MIKHAILOVICH PETROV,

did knowingly submit, and cause to be submitted, false and misleading export information through the Shippers Export Declaration (SED) and any successor document, and the Automated Export System (AES), in violation of Title 13, United States Code, Section 305(a)(1) and Title 18, United States Code, Section 2, as set forth in the below counts.

| COUNT | APPROX. DATE OF EXPORT | EXPORTED ITEM | ECCN |
|---|---|---|---|
| 8 | August 26, 2022 | Brake Steering Control Unit (P/N E21327107, S/N 9262) | 9A991 |
| 9 | October 27, 2022 | APU Actuator (P/N 106-1-1100-02, S/N 984) | 9A991 |
| 10 | October 29, 2022 | Inlet Assembly (P/N 15C0003007M1, S/N RMAIE280) | 9A991 |

### COUNT 11
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.    The general allegations in paragraphs 1 through 13 of this Indictment are hereby realleged and incorporated by reference herein.

2.    Beginning in or around April 2022, through the date of this Indictment, the exact

dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ANDREY MIKHAILOVICH PETROV,**

did knowingly and voluntarily combine, conspire, confederate, and agree with Co-conspirator 1, and other persons known and unknown to the Grand Jury, to commit an offense under Title 18, United States Code, Section 1956, by knowingly transporting, transmitting, and transferring monetary instruments and funds from a place in the United States to and through a place outside the United States, to wit, Uruguay, Turkey, and Denmark, with the intent to promote the carrying on of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

It is further alleged that the specified unlawful activity is smuggling goods from the United States, in violation of Title 18, United States Code, Section 554, as provided by Title 18, United States Code, Section 1956(c)(7)D).

## OBJECT OF THE CONSPIRACY

3.      It was the object of the conspiracy for the defendant to promote the conspirators' illegal business transactions; to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of illegal business transactions; and to illegally enrich the conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the Defendant and Co-conspirators sought to accomplish the object of the conspiracy included, among others, the following:

4.      At all relevant times during the conspiracy, **ANDREY MIKHAILOVICH PETROV** and U.S. Company 1 maintained bank accounts at U.S. Financial Institution 1. This

bank account was used on at least five separate occasions to send from or receive into the United States wire transfers of funds in payment for goods ultimately smuggled from the United States.

5. At all relevant times during the conspiracy, Uruguayan Company 1 maintained bank accounts in Uruguay at "Uruguayan Financial Institution 1." This bank account was used on at least two occasions to wire transfer funds into or through the United States in exchange for goods smuggled from the United States.

6. At all relevant times during the conspiracy, Turkish Company 1 maintained bank accounts in Turkey at "Turkish Financial Institution 1." This bank account was used on at least two occasions to wire transfer funds into or through the United States in exchange for goods smuggled from the United States.

7. On or about August 17, 2022, U.S. Financial Institution 1, located in the United States, received $55,258.13 from Uruguayan Financial Institution 1 in Uruguay. The originator of the transfer was Uruguayan Company 1 and the beneficiary was the account for US Company 1 at U.S. Financial Institution 1. The details of the wire specify that the transfer was for payment of I1857, that is, CCL ITEM ONE.

8. On or about August 17, 2022, U.S. Financial Institution 1, located in the United States, received $16,742.34 from Uruguayan Financial Institution 1 in Uruguay. The originator of the transfer was Uruguayan Company 1 and the beneficiary was the account for US Company 1 at U.S. Financial Institution 1. The details of the wire specify that the transfer was for payment of I1858, that is, CCL ITEM ONE.

9. On or about October 20, 2022, U.S. Financial Institution 1, located in the United States, received $64,232 from Turkish Financial Institution 1 in Turkey. The originator of the transfer was Turkish Company 1 and the beneficiary was the account for U.S. Company 1 at U.S. Financial Institution 1. The details of the wire specify that the transfer was for payment of S1900,

that is, CCL ITEM THREE.

10.     On or about November 10, 2022, U.S. Financial Institution 1, located in the United States, received $142,339 from Turkish Financial Institution 1 in Turkey. The originator of the transfer was Turkish Company 1, and the beneficiary was the account for U.S. Company 1 at U.S. Financial Institution 1. The details of the wire specify that the transfer was for payment of I1930, that is, CCL ITEM TWO.

## FORFEITURE ALLEGATIONS

1.     The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the Defendant, **ANDREY MIKHAILOVICH PETROV**, has an interest.

2.     Upon conviction of a violation, or conspiracy to commit a violation, of Title 18, United States Code, Section 554, as alleged in this Indictment, the Defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.     Upon conviction of a violation, or conspiracy to commit a violation, of Title 50, United States Code, Section 4819, as alleged in this Indictment, the Defendant shall, in addition to any other penalty, forfeit to the United States, pursuant to Title 50, United States Code, Section 4819, any property:

> (A) used or intended to be used, in any manner, to commit or facilitate the violation;
>
> (B) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violation; and/or
>
> (C) constituting an item or technology that is exported or intended to be exported in violation of this subchapter.

4.      Upon conviction of a violation, or conspiracy to commit a violation, of Title 13, United States Code, Section 305, as alleged in this Indictment, the Defendant shall, in addition to any other penalty, forfeit to the United States, pursuant to Title 13, United States Code, Section 305:

>          (A) any interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation;

>          (B) any interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation; and

>          (C) any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the violation.

5.      Upon conviction of a violation, or conspiracy to commit a violation, of Title 18, United States Code, Section 1956, as alleged in this Indictment, the Defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

6.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

> a.    cannot be located upon the exercise of due diligence;

> b.    has been transferred or sold to, or deposited with, a third party;

> c.    has been placed beyond the jurisdiction of the court;

> d.    has been substantially diminished in value; or

> e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 13, United States Code, Section 305; Title 50, United States Code, Section 4819; Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b)(1).


FOREPERSON

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

MARC S. ANTON
ASSISTANT UNITED STATES ATTORNEY

FOR

SEAN HEIDEN
TRIAL ATTORNEY
NATIONAL SECURITY DIVISION

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**　　　　　　**CASE NO.:** _____

**v.**

ANDREY MIKHAILOVICH PETROV　　　　**CERTIFICATE OF TRIAL ATTORNEY**

_____/　**Superseding Case Information:**
　　　　　　　　Defendant.　　　　　　　New Defendant(s) (Yes or No)_____
**Court Division** (select one)　　　　　　Number of New Defendants _____
　☐ Miami　☐ Key West　☐ FTP　　Total number of new counts _____
　☑ FTL　☐ WPB

I do hereby certify that:

1.　I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.　I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3.　Interpreter: (Yes or No) Yes
　　List language and/or dialect: Russian

4.　This case will take ___4___ days for the parties to try.

5.　Please check appropriate category and type of offense listed below:

　　(Check only one)　　　　　　　　(Check only one)
　　I　☑　0 to 5 days　　　　　☐ Petty
　　II　☐　6 to 10 days　　　　☐ Minor
　　III　☐　11 to 20 days　　　☐ Misdemeanor
　　IV　☐　21 to 60 days　　　☑ Felony
　　V　☐　61 days and over

6.　Has this case been previously filed in this District Court? (Yes or No) No
　　If yes, Judge_____ Case No._____

7.　Has a complaint been filed in this matter? (Yes or No) No
　　If yes, Judge _____ Magistrate Case No._____

8.　Does this case relate to a previously filed matter in this District Court? (Yes or No) No
　　If yes, Judge _____ Case No._____

9.　Defendant(s) in federal custody as of _____

10.　Defendant(s) in state custody as of _____

11.　Rule 20 from the _____ District of _____

12.　Is this a potential death penalty case? (Yes or No) No

13.　Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No

14.　Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

15.　Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

16.　Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
　　　Marc S. Anton
　　　Assistant United States Attorney
　　　FL Bar No.　　　　0148369

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name: ANDREY MIKHAILOVICH PETROV** _____

**Case No:** _____

Count #: 1

Conspiracy to Defraud the United States _____

In violation of Title 18, United States Code, Section 371 _____
* **Max. Term of Imprisonment: 5 years**
* **Mandatory Min. Term of Imprisonment (if applicable): None**
* **Max. Supervised Release: 3 years**
* **Max. Fine:  $250,000**

Counts #: 2-4

Unlawful Export of Controlled Goods to Russia _____

In violation of Title 50, United States Code, Section 4819 _____
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): None**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $1,000,000**

Counts #: 5-7

Smuggling Goods from the United States _____

In violation of Title 18, United States Code, Section 554 _____
* **Max. Term of Imprisonment: 10 years**
* **Mandatory Min. Term of Imprisonment (if applicable): None**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Counts #: 8-10

False Export Information

In violation of Title 13, United States Code, Section 305
* **Max. Term of Imprisonment: 5 years**
* **Mandatory Min. Term of Imprisonment (if applicable): None**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $10,000**

Count #: 11

Conspiracy to Commit Money Laundering

In violation of Title 18, United States Code, Section 1956(h)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): None**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $500,000 or twice the value of the property involved in the transactions**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**